## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID GIBBS,
    *Plaintiff*,

    v.

UTILIZATION REVIEW COMMITTEE
MEMBERS JOHN DOE 1-7 *et al.*,
    *Defendants*.

No. 3:20-cv-1119 (JAM)

## INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Plaintiff David Gibbs is a prisoner in the custody of the Connecticut Department of

Correction ("DOC"). He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. §

1983 against numerous DOC employees and entities, principally alleging that they were

deliberately indifferent to his serious medical needs, retaliated against him, and discriminated

against him in violation of his constitutional rights, and that they denied him rights in violation

of the Americans with Disabilities ("ADA") and the Rehabilitation Act. He seeks damages,

declaratory relief, and injunctive relief in connection with his claims. For the reasons set forth

below, I will allow one of Gibbs's claims against one of the defendants to proceed after my

initial review.

### BACKGROUND

Gibbs names 18 defendants: seven John Doe members of the Utilization Review

Committee ("URC"), Dr. Fedus, Health Services Administrator ("HSA") Lightner, HSA Fury,

Dr. Mazzocca, John Doe #8, Dr. Pillai, APRN Tawana Furtique, APRN Victoria Stork, LPN

Kevin, UCONN Health Services, and Nurse Rose.[1] Doc. #1 at 1-4. Each defendant is sued in

---

[1] Gibbs spells the names of several defendants differently throughout the complaint. For simplicity, I refer to each
defendant throughout this ruling using their name as spelled in the case caption.

their individual and official capacities. *Ibid*.

The following facts are alleged in Gibbs's complaint and are accepted as true for purposes of initial review only. After being arrested for murder in 1993, Gibbs injured his right ankle while in pretrial custody at Harford Correctional Institution. *Id.* at 5 (¶ 16). He had serious foot pain through 1998, when he was convicted and transferred to MacDougall-Walker Correctional Institution ("MWCI"). *Ibid*. (¶ 17). He immediately requested to see a foot doctor because of "excruciating pain in [his] right ankle which made ambulating very difficult." *Ibid*. Despite his pain, the only treatment Gibbs received was low level pain medication and instructions to exercise regularly, even though exercise would cause his ankle to swell. *Ibid*. (¶¶ 18-19). Gibbs was eventually diagnosed with degenerative joint disease. *Id*. at 6 (¶ 20).

Gibbs's pain persisted and he requested that his doctors provide an MRI, but the URC refused on several occasions to authorize Gibbs to see an orthopedic doctor or to have an MRI performed because it was "not a medical necessity, and [] the current treatment appears appropriate." *Ibid*. (¶¶ 21-24). The URC's refusal to authorize further treatment was "solely to save the UCONN Health Center money," which Gibbs alleges was consistent with the URC and UCONN Health Center's practices compromising prisoner healthcare for financial gain that were later revealed publicly. *Id*. at 6-9 (¶¶ 23, 25-32). Gibbs also alleges that white inmates "are routinely given better medical care, and are more likely to be seen by a specialist" than black inmates because black inmates "are considered to be able to tolerate more pain." *Id*. at 8 (¶ 30).

At some point, Gibbs met with podiatrist Dr. Fedus, who relied on old reports to diagnose Gibbs with degenerative joint disease and osteoarthritis, while ignoring diagnostic reports that suggested Gibbs's ankle injuries were trauma-related. *Id*. at 9 (¶¶ 33-35). At one visit, Dr. Fedus told Gibbs he should wait until he got home to have an MRI because of the cost; after Gibbs told

2

Dr. Fedus he was serving a life sentence, Dr. Fedus said that "he does not think that the Department should be paying for inmates to have an MRI done." *Id*. at 10 (¶¶ 36-37).

The condition of Gibbs's ankles continued to worsen, and he was in "constant pain every day." *Ibid*. (¶ 38). Over the years, the condition of other areas of his body continued to worsen, and it became difficult for him to do minor tasks requiring minimal lifting. *Ibid*. After Gibbs complained about his worsening condition, Dr. Fedus fabricated statements in Gibbs's reports to prevent him from getting the help he needed. *Id*. at 10-11 (¶ 39). Dr. Fedus also submitted URC reports in a manner that he knew was insufficient to obtain a favorable review. *Id.* at 12 (¶ 45).

In 2008, Gibbs met with Dr. Mazzocca, who diagnosed Gibbs's ankle injuries and stated nothing further could be done about his right ankle absent an operation. *Id*. at 13 (¶¶ 47-49). Dr. Fedus delayed the process by "continually ordering frivolous X-rays," and the defendants "continued to provide substandard treatment in the form of pills and shoe inserts for years." *Ibid*. (¶ 48). Gibbs's ankles became so swollen that his foot would no longer fit into his shoes, but he received threats of disciplinary action if he arrived at the medical unit wearing flip-flops. *Ibid.* (¶¶ 49-50). Thus, Gibbs was forced wear shoes that caused open wounds on his foot. *Ibid*.

Gibbs wrote to HSA Lightner about his issues in February 2011, and she said he would be sent to a different podiatrist and she would oversee the process to ensure Gibbs did not have the same issues he had with Dr. Fedus. *Id.* at 11 (¶¶ 40-41). Gibbs met with that podiatrist once, but he was then told the podiatrist had stopped working at the facility and was again assigned to Dr. Fedus. *Ibid*. (¶¶ 41-42). Lightner did not oversee the process, ignored Gibbs's further complaints about Dr. Fedus, and stated that it did not matter to her that Gibbs was unsatisfied with his medical services. *Id*. at 11-12 (¶¶ 42-43). Both HSA Lightner and HSA Fury failed to ensure that Gibbs received proper medical care. *Id*. at 12 (¶ 43).

In October 2017, Gibbs had an MRI on his left ankle "after more than two decades of needless suffering[,]" which showed a number of injuries that led to a surgery in November 2017. *Id.* at 14 (¶¶ 51-52). After the surgery, Gibbs was placed in the prison infirmary with a "Cam Walker Boot." *Ibid.* (¶ 53).[2]

In December, Gibbs was told to remove the boot to start the weight bearing process, but he was not given personal training or rehabilitation instructions. *Ibid.* He met with Dr. Pillai when his foot became swollen a week later and requested a follow-up with the UCONN Health Center, but Dr. Pillai stated the issue was the breaking of scar tissue and that it was not infected, so no request would be made to the URC. *Id.* at 14-15 (¶¶ 53-54).

A nurse stated "his foot doesn't look good at all," and Dr. Pillai agreed to schedule a follow-up, but none ever occurred. *Id.* at 15 (¶ 55). Dr. Pillai "denied [Gibbs] rudimentary treatment which was contrary to good medical practice[,]" although he did provide a wedge to elevate Gibbs's foot. *Ibid.* (¶ 56).

When Gibbs complained that the issue was more severe than the breaking of scar tissue, Dr. Pillai allegedly retaliated by demanding that the nurse take his crutches, provide him with a cane, and discharge him from the infirmary. *Ibid.* (¶ 57). Gibbs was unable to walk with the cane, and he asked a nurse for crutches, which she provided. *Id.* at 16 (¶ 58). Long-term use of wedges, crutches, and other medical devices is not allowed, as there are not enough to go around. *Ibid.*

In January 2018, LPN Kevin berated Gibbs for allegedly having a Cam boot, even though it had been returned when Gibbs was discharged from the infirmary. *Ibid.* (¶ 59). After a nurse confirmed Gibbs no longer had the boot, Gibbs asked if he could request the follow-up Dr. Pillai

---

[2] The complaint states that this occurred in November 2018 and that the boot was removed in December 2018, but based on the generally chronological nature of Gibbs's complaint and the context, it appears Gibbs intends to allege that these events occurred in 2017 following his surgery.

had promised, but Kevin dismissed him and threatened to issue a disciplinary report if Gibbs ever returned wearing a boot. *Ibid*. (¶¶ 60-61).

In March 2018, Kevin called Gibbs to the medical department to address a request Gibbs sent to HSA Lightner, and stated that a request would be made for follow-up to the UCONN Health Center. *Id*. at 17 (¶ 62).

In May 2018, Gibbs met with Dr. Mazzocca at MCWI, who stated that Gibbs's foot was "exceptionally weak," that he was requesting an MRI with a follow-up in October 2018, and that his report stated that Gibbs should be allowed "soft back sneakers" to aid in his rehabilitation. *Ibid.* (¶ 63).

In October 2018, Gibbs received a follow-up appointment and X-ray instead of an MRI as promised, and the attending doctor stated no MRI had been requested. *Ibid.* (¶ 64). Unnamed MCWI medical personnel then refused to see Gibbs, which prevented him from receiving the treatment that the doctor had recommended, including that ice be supplied to Gibbs to address inflammation and daily stretching. *Id*. at 17-18 (¶¶ 65-67).

Gibbs made several requests to the medical department for a follow-up appointment, but did not receive one. *Id*. at 18-19 (¶¶ 67-70). He filed a health services complaint in September 2019, and filed an appeal to that complaint in December 2019 after he had not received a response. *Id*. at 19 (¶¶ 70-71). After he filed his appeal, Nurse Rose called him and said she had not received his original complaint, but that she would talk to APRN Stork to schedule an appointment and would talk to APRN Furtique about renewing his footwear pass. *Ibid.* (¶¶ 71-72). Gibbs filed another health service grievance in December 2019. *Ibid.* (¶ 73).

In January 2020, Gibbs met with Stork, but she refused to give him medical treatment that would contradict any decisions made by Furtique "under the guise that [Furtique] would be

mad if she overrides her authority." *Id*. at 20 (¶ 74). Gibbs sent several requests to Furtique and spoke to her about not receiving proper medical care, but she never answered his requests. *Ibid*. (¶ 75).

Gibbs filed another appeal in February 2020, and in March 2020 he asked Nurse Rose why he had not received a response, even though administrative policy requires a receipt to be sent in response to all grievances. *Ibid*. (¶ 76). In April 2020, Gibbs filed another health services review directed to Medical Director Salvator Diaz, and copied Chief of Medical Operations Dr. Byron Kennedy, but he never received a response. *Ibid*. (¶ 77).

In April 2020, Gibbs signed a form placing him on notice that an MRI would be conducted, but he still has not been called to address his issues. *Id*. at 23 (¶ 83).

In June 2020, Gibbs met with Nurse Rose and stated that he had not received the MRI he requested or the renewal of his footwear pass. *Id*. at 21 (¶ 78). Nurse Rose, the grievance coordinator, told Gibbs that she had given his grievance to APRN Stork and believed that Stork had responded to his grievance, and that she would relay Gibbs's concerns to Colleen Gallagher. *Ibid*. (¶¶ 78-79). Nurse Rose later told Gibbs that his footwear pass would not be renewed because "Gallagher believed that doing so would only encourage other inmates to seek outside footwear (footwear not sold by the prison commissary)." *Ibid*. (¶ 79). Gallagher wrote a response to Gibbs that misstated several facts and questioned why he would need rehabilitative footwear two years after his surgery. *Ibid*. (¶ 80). She also stated that Gibbs had not included the proper documentation in his appeal—which Gibbs asserts is false—so she could not answer it. *Id*. at 22 (¶ 80). Gallagher said Gibbs could resubmit his grievance, which Gibbs did in July 2020, but he has not received a response. *Ibid*. Gibbs also wrote to Dr. Byron Kennedy in July 2020 explaining "all that had transpired," but did not receive a response. *Ibid*. (¶ 81).

Gibbs was taken to an outside provider for footwear for osteo-arthritis, although his ankle injury is more severe than osteo-arthritis. *Ibid.* (¶ 82). The provider did not have the softback footwear recommended by Gibbs's doctor, but did have a shoe with a soft collar that Gibbs agreed to try, and Gibbs was told this footwear was ordered for him. *Ibid.*

Gibbs asserts that he has been denied medically-necessary recommended footwear, which has caused him unnecessary pain and suffering and exacerbated his injury, including that his right knee is giving out due to his having to compensate for his injured ankles. *Ibid.* He remains in severe pain, which now extends to his hips, back, and feet. *Id.* at 23 (¶ 83).

On August 5, 2020, Gibbs filed this complaint, which alleges claims against all defendants for deliberate indifference to his serious medical needs in violation of the Eighth Amendment, against Dr. Fedus for retaliation in violation of his First Amendment rights, against the URC, Dr. Fedus, Dr. Pillai, Dr. Fury, and John Doe Nurse for discriminating against him in violation of the Equal Protection Clause, and against APRN Furtique for denying him the footwear he needs for his rehabilitation in violation of the ADA and Rehabilitation Act.[3] *Id.* at 26-28 (¶¶ 93-104). Gibbs seeks money damages against the defendants in their official and individual capacities as well as declaratory and injunctive relief. *Id.* at 28-30.

---

[3] Although the "claims for relief" section of Gibbs's complaint does not reference the Rehabilitation Act, in other parts of his complaint Gibbs references the Rehabilitation Act in ways that suggest he intends to bring claims under both the ADA and the Rehabilitation Act. *See* Doc. #1 at 1, 23. Additionally, Gibb's complaint asserts various state law malpractice and negligence claims. *See id.* at 28-30. I will not address his state law claims now because this review for purposes of 28 U.S.C. § 1915A is limited to federal law claims. That is because the core purpose of an initial review order is to make a speedy initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there are no facially plausible federal law claims against any of the named defendants, then the Court would decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367. On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment. More generally, the Court's determination for purposes of an initial review order under 28 U.S.C. § 1915A that any claim may proceed against a defendant is without prejudice to the right of any defendant to seek dismissal of any claims by way of a motion to dismiss or motion for summary judgment in the event that the Court has overlooked a controlling legal principle or if there are additional facts that would warrant dismissal of a claim.

**DISCUSSION**

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

### *Statute of limitations*

As a threshold matter, I will consider whether any of Gibbs's claims are time-barred by the statute of limitations because the allegations in Gibbs's complaint date back more than two decades. Although the statute of limitations is ordinarily an affirmative defense, a court may "dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitation defense are set forth in the papers plaintiff himself submitted." *Walters v. Industrial and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) (internal quotations omitted); *see also Pino v. Ryan*, 49 F.3d 51, 53-54 (2d Cir. 1995)

8

(prisoner's claim subject to *sua sponte* dismissal where "the injuries complained of occurred more than five years before the filing of the complaint—well outside the applicable three-year limitations period" and where "there are no applicable tolling provisions as a matter of law, and plaintiff has alleged no facts indicating a continuous or ongoing violation of his constitutional rights").

A civil rights claim pursuant to 42 U.S.C. § 1983 is subject to a three-year statute of limitations, as are ADA and Rehabilitation Act claims. *See Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994); *Bond v. Connecticut Bd. of Nursing*, 622 F. App'x 43, 44 (2d Cir. 2015). "Under federal law, a cause of action generally accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Nat'l R.R. Passenger Corp. v. McDonald*, 779 F.3d 97, 101 (2d Cir. 2015) (internal quotations omitted). There is an exception to the statute of limitations under the "continuing violation" doctrine, which "applies to claims composed of a series of separate acts that collectively constitute one unlawful practice" and delays the running of the limitations period until "the defendant has engaged in enough activity to make out an actionable claim." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (cleaned up). But the "'continuing violation' rule does not apply merely because a plaintiff experiences continuing harm from a defendant's otherwise discrete time-barred act." *Andrews v. Town of Wallingford*, 2017 WL 3588571, at *3 (D. Conn. 2017), *aff'd*, 739 F. App'x 62 (2d Cir. 2018).

Gibbs filed his complaint on August 5, 2020. It follows that all of Gibbs's allegations concerning discrete, wrongful acts by one or more defendants that occurred prior to August 5, 2017, are barred by the statute of limitations unless an exception applies. Although Gibbs's complaint does not always provide dates for his allegations, it is clear that many of his allegations regarding his injuries and alleged deprivations occurred well before 2017, including

the URC's denial of an MRI while he was being treated by Dr. Silvis, the treatment he received from Dr. Mazzocca in 2008, Dr. Fedus's refusal to seek an MRI and retaliation against Gibbs for complaining, and HSA Lightner's failure to oversee his medical process and having him treated by Dr. Fedus rather than another doctor in 2011. After those allegations, Gibbs next details the harm he suffered because of the allegedly inadequate medical care and rehabilitation support he received after his surgery in November 2017.

Although Gibbs's post-2017 ankle injuries may be traceable to the injuries he incurred in DOC custody in the 1990s and the allegedly inadequate medical care he received in the years that followed, Gibbs alleges that he was in serious pain for many years following his injuries, that defendants were deliberately indifferent to his serious medical needs for many years, and that Dr. Fedus retaliated against him well before 2017. Because Gibbs was plainly aware of these injuries and the activities that would potentially give rise to an actionable claim occurred before 2017, the continuing violation doctrine does not apply, and all of Gibbs's claims based on allegations of conduct occurring prior to August 2017 are time-barred.

Accordingly, Gibbs's claims are dismissed to the extent they are based on allegations of conduct that occurred prior to August 2017, including his First Amendment retaliation claim against Dr. Fedus and his Eighth Amendment deliberate indifference claims against the URC, Dr. Fedus, Dr. Mazzocca, and the UCONN Health Center. I will only consider Gibbs's claims that arise after August 5, 2017 in the remainder of my initial review, which claims principally relate to Gibbs's surgery in November 2017 and his subsequent medical treatment.

### Eighth Amendment deliberate indifference

Gibbs alleges that each defendant was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Doc. #1 at 27 (¶¶ 97-100, 102).

10

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. "An Eighth Amendment claim arising out of inadequate medical care requires a demonstration of 'deliberate indifference to [a prisoner's] serious medical needs.'" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prevail on such a claim, a plaintiff must prove that "(1) objectively, the alleged deprivation of medical care was 'sufficiently serious,' and (2) subjectively, that the defendants acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will result.'" *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'" *Hill*, 657 F.3d at 123 (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)).

To be "sufficiently serious," the deprivation of medical care must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* at 122. This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. Factors to consider include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702.

Because Gibbs's Eighth Amendment claims differ with respect to each defendant, I will address them each in turn.

11

*Dr. Pillai*

Gibbs alleges that Dr. Pillai was deliberately indifferent to his serious medical needs when he failed to provide basic post-surgery rehabilitation and discharged him without crutches after his surgery.[4] Doc. #1 at 27 (¶ 100). For the objective prong, Gibbs has plausibly alleged a "sufficiently serious" harm because of his chronic and substantial pain, his inability to walk after Dr. Pillai discharged him without crutches, and the nurse's comment that "his foot doesn't look good at all," which suggests a reasonable doctor or patient would find his injury important and worthy of comment or treatment. *See Chance*, 143 F.3d at 702; *see also Dooley v. Cook*, 2020 WL 6395576, at *8 (D. Conn. 2020) (allegations that a plaintiff "experienced pain and increased damage due to the inadequate and delayed medical treatment for his foot problems" satisfy the objective element on initial review). As to the subjective prong, Gibbs's allegations that Dr. Pillai did not provide a follow-up appointment he had agreed to schedule on the basis of the severity of Gibbs's pain and his visible injury, and that he discharged Gibbs from the infirmary without crutches after Gibbs complained that his issues were more severe than Dr. Pillai's diagnosis, are sufficient for initial pleading purposes to plausibly allege that Dr. Pillai had actual awareness of the substantial risk of serious harm that could result from his actions to not provide further medical care.

Accordingly, I conclude that Gibbs has sufficiently alleged that Dr. Pillai acted with deliberate indifference to his serious medical needs for initial pleading purposes. His claim for damages may proceed against Dr. Pillai in his individual capacity only because DOC employees

---

[4] Gibbs also alleges that John Doe Nurse was deliberately indifferent to his serious medical needs after his surgery, Doc. #1 at 27 (¶ 100), but does not name John Doe Nurse in the case caption. If Gibbs wishes to proceed against persons other than those named in the case caption of his complaint, he may file an amended complaint within 30 days that properly names such persons or entities in the case caption. *See* Fed. R. Civ. P. 10(a); *Brown v. Ruiz*, 2019 WL 1533438, at *2 n.2 (D. Conn. 2019).

12

are immune from money damages suits in their official capacities. *See Currytto v. Doe*, 2019 WL 2062432, at *4 (D. Conn. 2019) (citing *Pennhurst State Sch. & Hosp. v. Haldermann*, 465 U.S. 89, 100 (1984) and *Davis v. New York*, 316 F.3d 93 (2d Cir. 2002)).

### Nurse Rose, APRN Furtique, APRN Stork, and LPN Kevin

Gibbs also alleges that the defendants Nurse Rose, APRN Furtique, APRN Stork, and LPN Kevin were deliberately indifferent to his medical needs when they failed to follow up on care recommended by UCONN Health Services to reduce expenses.[5] Doc. #1 at 27 (¶ 97). Although it is not clear exactly which factual allegations Gibbs is referring to for this claim, I interpret his claim as arguing that these defendants were deliberately indifferent to his serious medical needs when they did not provide him adequate medical care following his surgery, including the softback footwear recommended by his doctor, which has caused him further injury to his knee, hips, and back. These types of allegations can satisfy the objective element for initial pleading purposes. *See Dooley*, 2020 WL 6395576, at *8 (D. Conn. 2020).

Even assuming that Gibbs satisfies the objective element, however, his complaint does not contain factual allegations that plausibly allege that any of these defendants acted with the subjective recklessness needed to maintain a deliberate indifference claim or that their actions were not made on the basis of their sound medical judgment. *See Chance*, 143 F.3d at 703. Gibbs does not assert any non-conclusory facts to show that his inability to get softback shoes was due to these defendants' attempt to reduce costs; indeed, Gibbs alleges that it was the outside provider who did not have softback shoes available, and that he agreed to try another type of shoe. Nor does Gibbs allege that any of these defendants was personally involved in his denial of

---

[5] Gibbs also states that this claim is brought against Jane Doe Supervisor, but does not name this person in the case caption.

ice and stretching treatment following his surgery. For LPN Kevin, Gibbs only alleges that he incorrectly claimed Gibbs had a Cam boot, and that he did not allow Gibbs to request a follow-up appointment in January 2018, though he later did make a request in March 2018. For APRN Furtique, Gibbs does not provide any facts suggesting why Furtique denied his requests or that her decisions were not within her sound medical judgment. And Gibbs's allegations simply indicate that APRN Stork deferred to Furtique's reasoning and that Nurse Rose relayed Gibbs's concerns to other prison staff and told Gibbs their responses—far short of reckless disregard for his serious medical needs.

Accordingly, I will dismiss Gibbs's deliberate indifference claims against Nurse Rose, APRN Furtique, APRN Stork, and LPN Kevin because Gibbs's complaint does not plead sufficient facts to plausibly allege that those defendants violated his constitutional rights.

### HSA Lightner

Gibbs alleges that HSA Lightner "deliberately turned a blind eye to obvious violations of protocols with respect to [Gibbs's] medical issues," amounting to deliberate indifference. Doc. #1 at 27 (¶ 98). But the only allegation Gibbs makes against Lightner that is not time-barred is that Gibbs sent Lightner an inmate request in early 2018, which was responded to in March 2018. This allegation does not show that Lightner acted improperly—much less unconstitutionally—in response to Gibbs's inmate request and his health issues. Moreover, "[i]t is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Gibbs has not alleged facts suggesting that HSA Lightner had any involvement in any constitutional violations beyond responding to an inmate request form he submitted and beyond

14

Gibbs's conclusory statement that Lightner ignored "obvious violations of protocols." Accordingly, I will also dismiss Gibbs's Eighth Amendment claim against HSA Lightner.

### Fourteenth Amendment equal protection

Gibbs alleges that the URC, Dr. Fedus, Dr. Pillai, HSA Fury, and John Doe Nurse violated his right under the Fourteenth Amendment to equal protection by failing to offer him equal treatment to his white counterparts. Doc. #1 at 28 (¶ 104).

"The Equal Protection Clause ... commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "To state an equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Trowell v. Theodarakis*, 2018 WL 3233140, at *3 (D. Conn. 2018) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). Alternatively, an equal protection claim can sometimes be sustained if the plaintiff "claims that he has been irrationally singled out as a 'class of one.'" *Trowell*, 2018 WL 3233140, at *3 (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)). Here, because Gibbs only states a conclusory assertion that he was treated differently than white counterparts but does not allege any facts in support of that assertion or that the discriminatory treatment was based on his race, he has not alleged plausible grounds for relief under the Equal Protection Clause.

*ADA and Rehabilitation Act*

Gibbs alleges that Furtique's failure to provide rehabilitation after his surgery and footwear necessary for his rehabilitation denied him a reasonable accommodation in violation of the ADA and the Rehabilitation Act.[6] Doc. #1 at 23-24, 27 (¶¶ 84-89, 101).

In order to prevail on a claim under either Title II of the ADA or § 504 of the Rehabilitation Act, a plaintiff "must show that 1) he is a qualified individual with a disability; 2) [the defendant] is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [the defendant's] services, programs, or activities [or that the defendant] otherwise discriminated against him by reason of his disability." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).[7] There are "three available theories" of discrimination that can be used to establish the third prong of an ADA and Rehabilitation Act claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *see also Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003) (explaining that the ADA requires covered entities to make "reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities.") (citations omitted).

Gibbs brings his ADA and Rehabilitation Act claim under a failure-to-accommodate theory of liability. The Second Circuit has explained that "a reasonable accommodation need not

---

[6] Gibbs also states that the "DOC Health Services" violated the ADA and Rehabilitation Act, but does not name the DOC Health Services as a defendant in the case caption. Nonetheless, a claim against DOC Health Services would be "redundant" because "an official capacity lawsuit against a state official [like Furtique] is tantamount to a claim against the State [agency] itself." *Walsh v. Coleman*, 2019 WL 6529825, at *9 (D. Conn. 2019).

[7] I evaluate Gibbs's ADA and Rehabilitation Act claims using the same analysis because they do not implicate the subtle distinctions between the statutes. *See Wright*, 831 F.3d at 72 ("Because the standards under both statutes are generally the same and the subtle distinctions between the statutes are not implicated in this case, we treat claims under the two statutes identically.") (internal quotations omitted).

be perfect or the one most strongly preferred by the plaintiff, but it still must be effective."
*Wright*, 831 F.3d at 72 (cleaned up). "In examining [a reasonable accommodation] claim, we ask
whether a plaintiff with disabilities as a practical matter was denied meaningful access to
services, programs or activities to which he or she was legally entitled." *Ibid.* (internal quotation
omitted).

Here, even if I assume that Gibbs is a qualified individual because of the difficulty he
alleges he has with basic life tasks due to his injuries, he has not alleged any facts to suggest that
the failure to provide him with softback shoes has deprived him of the opportunity to participate
in or benefit from the DOC's services, programs, or activities, or that Furtique or the DOC
discriminated against him because of his disability. While Gibbs alleges that he is in severe pain
and that he has trouble ambulating, conducting manual tasks, sleeping, and standing due to his
ankle injuries, he does not allege that his pain or these limitations denied him meaningful access
to any DOC programs, services, or activities to which he is legally entitled.

As a result, Gibbs's factual allegations only support a claim that his medical treatment is
inadequate, which is not sufficient to state a claim under the ADA or Rehabilitation Act. *See*
*Currytto v. Furey*, 2019 WL 1921856, at *4 (D. Conn. 2019) ("Because his complaint goes to the
inadequacy of treatment for his disability rather than discriminatory action motivated by his
disability, he has failed to allege a plausible claim for relief under the ADA."); *Cordero v.*
*Semple*, 696 F. App'x 44, 45 (2d Cir. 2017) (affirming the dismissal of an ADA claim because
the prisoner "did not allege that his conditions prevented him from participating in any programs
or activities").

Accordingly, Gibbs has not alleged a plausible claim under the ADA or Rehabilitation
Act, and I will dismiss these claims against Furtique.

*Declaratory and injunctive relief*

Gibbs requests declaratory relief that the defendants violated his constitutional and civil rights and a variety of injunctive relief. Doc. #1 at 28-29. I will dismiss his claim for declaratory relief because the Eleventh Amendment forecloses this type of relief against state officials to declare that they violated federal law in the past. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993). Similarly, as to injunctive relief, a plaintiff may maintain this type of claim against a state official only to the extent that he alleges an ongoing violation of the constitutional rights for which a federal court may enter an order of prospective relief against a state official in his official capacity. *See, e.g., Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Gibbs's only plausible claim is against Dr. Pillai for his past deliberate indifference, and he has not alleged any facts to show an ongoing violation of his constitutional rights by Dr. Pillai or any of the defendants. Therefore, I will dismiss Gibbs's claims for declaratory or injunctive relief.

## CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

(1) Gibbs's Eighth Amendment deliberate indifference claim may proceed only against Dr. Pillai in his individual capacity for money damages. The Court DISMISSES without prejudice all of Gibbs's other federal law claims against all other defendants.

(2) If Gibbs believes there are additional facts he can allege that will overcome any of the deficiencies identified in this ruling, or if he would like to proceed against persons or entities other than those named in the case caption of his complaint, then he may file a proposed amended complaint by **January 4, 2021** that alleges those facts or properly names such persons

or entities in the case caption.

(3) The Clerk shall verify the current work address for Dr. Pillai with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to him at the confirmed address within **twenty-one (21) days of this Order**, and report to the Court on the status of the waiver request by not later than the **thirty-fifth (35) day after mailing**. If the defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on him, and he shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(4) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(5) Dr. Pillai shall file his response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to him.

(6) The discovery deadline is **six months (180 days) from the date of this Order**. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this Order. The order can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

(7) All motions for summary judgment shall be filed within **seven months (210 days) from the date of this Order.**

(8) Pursuant to Local Rule 7(a), a nonmoving party must respond to a dispositive motion

(i.e., a motion to dismiss or a motion for summary judgment) within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

(9) If Gibbs changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)(2) provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Gibbs must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Gibbs has more than one pending case, he should indicate all of the case numbers in the notification of change of address. Gibbs should also notify the defendant or defense counsel of his new address.

(10) Gibbs shall utilize the Prisoner E-Filing Program when filing documents with the Court. Gibbs is advised that the Program may be used only to file with the Court. As discovery requests are not filed with the Court, the parties must serve discovery requests on each other by regular mail.

It is so ordered.

Dated at New Haven this 4th day of December 2020.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge

20