UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DAVID GIBBS,
    *Plaintiff*,

v.

UTILIZATION REVIEW COMMITTEE *et al.*,
    *Defendants*.

No. 3:20-cv-1119 (JAM)

## SECOND INITIAL REVIEW ORDER AND
## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Plaintiff David Gibbs is a sentenced prisoner in the custody of the Connecticut Department of Correction (DOC). He has filed a second amended complaint alleging that the DOC and certain medical personnel have been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and that they have violated his rights under the Americans with Disabilities Act (ADA) and the Rehabilitation Act.

This ruling constitutes my initial review order of the second amended complaint pursuant to 28 U.S.C. § 1915A. It also addresses a partial motion to dismiss filed by two of the defendants. In summary, I conclude that Gibbs has alleged plausible claims for relief under the Eighth Amendment against all three of the individual defendants and a plausible claim for relief under the ADA and Rehabilitation Act against the DOC.

### BACKGROUND

Gibbs initially filed a complaint against 18 defendants.[1] On December 4, 2020, I entered an initial review order pursuant to § 1915A dismissing all of his claims without prejudice except

---

[1] Doc. #1 at 2–4 (¶¶ 5–15).

1

for his Eighth Amendment deliberate indifference claim against Dr. Pillai. *See Gibbs v. Doe 1–7*, 2020 WL 7129584 (D. Conn. 2020).

Gibbs eventually filed a second amended complaint, narrowing his case to name only four defendants: the DOC, Dr. Pillai, Dr. Fedus, and Nurse Tawanna Furtique.[2] The second amended complaint alleges two types of federal claims. First, it alleges pursuant to 42 U.S.C. § 1983 that these four defendants were deliberately indifferent to Gibbs's serious medical needs in violation of the Eighth Amendment.[3] Second, it alleges that the defendants failed to make reasonable accommodations for his disability in violation of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a).[4]

I will summarize the somewhat lengthy allegations of the second amended complaint. After being arrested for murder in 1993, Gibbs injured his right ankle while in pretrial custody at the Hartford Correctional Center.[5] Gibbs was still experiencing some pain related to his ankle when, in 1998, he was convicted, sentenced to life in prison, and transferred to MacDougall-Walker Correctional Institution (MacDougall).[6]

At MacDougall, Gibbs immediately requested to see a foot doctor because of the "excruciating pain in his right ankle[,] which made ambulating very difficult."[7] Despite his pain, the only treatment Gibbs received was low-level pain medication and instructions to exercise his ankle regularly, even though exercise would cause his ankle to swell.[8]

---

[2] Doc. #26 at 3 (¶¶ 5–8).
[3] *Id.* at 19–24 (¶¶ 93–97).
[4] *Id.* at 24–25 (¶¶ 98–107). The second amended complaint also alleges a state law claim for reckless, wanton, and/or willful misconduct. *Id.* at 25–26 (¶¶ 108–10). The defendants' motion to dismiss does not address the state law claim, and there is otherwise no need for me to address the state law claim for purposes of an initial review order. *See Thompson v. Quiros*, 2021 WL 5301240, at *3 n.48 (D. Conn. 2021).
[5] Doc. #26 at 4 (¶¶ 10–11).
[6] *Ibid.* (¶¶ 13–14).
[7] *Ibid.* (¶ 14).
[8] *Ibid.* (¶¶ 15–17).

Gibbs was later diagnosed with degenerative joint disease in both his right and left ankles.[9] His pain persisted, and he requested an MRI, but the DOC's Utilization Review Committee refused on several occasions to authorize Gibbs to see an orthopedic doctor or to have an MRI performed because it "was not a medical necessity and … the current treatment appear[ed] appropriate."[10]

At some point, Gibbs met with podiatrist Dr. Fedus, who allegedly relied on old reports to diagnose Gibbs with degenerative joint disease and osteoarthritis, while ignoring diagnostic reports that suggested Gibbs's ankle injuries were trauma related.[11] At one visit, Dr. Fedus told Gibbs he should wait until he got home to have an MRI because of the cost; then after Gibbs told Dr. Fedus that he was serving a life sentence, Dr. Fedus said that "he did not believe that the DOC should pay for inmates to [obtain] MRIs."[12]

In 2008, Gibbs met with orthopedist Dr. Mazzocca, who further diagnosed Gibbs's ankle injuries.[13] Like Dr. Fedus, Dr. Mazzocca also allegedly failed to acknowledge diagnostic reports indicating that Gibbs's ankle injuries were trauma related.[14]

Gibbs's condition grew worse.[15] He was in constant pain, and his ankle and foot injuries started to affect other areas of his body.[16] His "inability to ambulate" made it difficult to accomplish minor tasks and began to affect his daily life activities.[17] At some point, Gibbs's

---

[9] *Id.* at 5 (¶ 18).
[10] *Id.* at 4–5 (¶¶ 17, 19–22).
[11] *Id.* at 5–6 (¶ 23).
[12] *Id.* at 6 (¶ 24).
[13] *Ibid.* (¶ 25).
[14] *Ibid.*
[15] *Ibid.* (¶ 27).
[16] *Ibid.*
[17] *Ibid.*

ankles became so swollen that his feet would not fit into his shoes, and when he was able to fit his foot into a shoe, the foot would become sore and develop visible wounds.[18]

Dr. Fedus continued to see Gibbs but allegedly grew resentful toward him and "began to present an attitude of malice and indifference."[19] Dr. Fedus continued to deny Gibbs's requests for an MRI.[20]

In February 2011, Gibbs submitted a request for medical assistance to Health Services Administrator Lightner.[21] She assured him that he would be seen by a podiatrist other than Dr. Fedus in the future, and she told him that she would personally oversee his treatment going forward.[22] Gibbs met only once with the other podiatrist before he was told that the podiatrist had stopped working at the facility, and he was once again assigned to Dr. Fedus.[23] Lightner did not oversee the process, ignored Gibbs's further complaints about Dr. Fedus, and allegedly stated that it did not matter to her that Gibbs was unsatisfied with his medical treatment.[24]

Gibbs continued to receive treatment consisting of low-level pain medication and shoe inserts.[25] His ankles continued to swell.[26] At times, "because the pain was unbearable," he would wear slippers instead of shoes.[27] But he was threatened with discipline because only a member of the medical unit can authorize the use of slippers, and Dr. Fedus had refused to grant Gibbs authorization.[28]

---

[18] *Id.* at 6–7 (¶ 28).
[19] *Id.* at 7 (¶ 29).
[20] *Ibid.*
[21] *Ibid.* (¶ 30).
[22] *Ibid.* (¶ 31).
[23] *Ibid.* (¶¶ 32–33).
[24] *Id.* at 7–8 (¶¶ 34–36).
[25] *Id.* at 8 (¶ 37).
[26] *Ibid.* (¶ 38).
[27] *Ibid.*
[28] *Ibid.*

In mid-2017, another DOC doctor noticed Gibbs's swollen ankles and recommended an MRI, and so Gibbs finally received an MRI in October 2017.[29] The MRI revealed several injuries.[30] Around that same time, Gibbs became aware of diagnostic reports from 1998 and 2000 suggesting that his injuries were caused not by degenerative joint disease, as Dr. Fedus has diagnosed, but rather by trauma.[31]

As a result of the MRI, Gibbs was immediately scheduled for surgery on his left ankle.[32] After the surgery, Gibbs was housed in the MacDougall infirmary until approximately January 4, 2018.[33] Meanwhile, in late November 2017, Gibbs was placed in a "cam-walker boot," but contrary to his surgeon's discharge instructions, he did not simultaneously receive rehabilitation services.[34] He began the weightbearing process in December 2017, but he still was not provided rehabilitation.[35] Although Gibbs asked whether Dr. Fedus could recommend "soft-back" shoes, Dr. Fedus responded that "you were able to get yourself a MRI, you can find a way to get the shoes."[36] Dr. Fedus was "well aware" that regular shoes continued to exacerbate Gibbs's injuries and cause him pain.[37]

A week into the weightbearing process, Gibbs's foot became swollen, and Dr. Pillai came to examine the foot.[38] Dr. Pillai stated that the issue was the breaking of scar tissue and that the foot was not infected, and he refused Gibbs's request for a follow-up with the UConn Health

---

[29] *Id.* at 8–9 (¶¶ 39–40).
[30] *Id.* at 9 (¶ 40).
[31] *Ibid.* (¶ 41).
[32] *Ibid.* (¶¶ 42–43).
[33] *Ibid.* (¶ 44).
[34] *Id.* at 10 (¶ 47).
[35] *Ibid.* (¶ 48).
[36] *Ibid.* (¶ 46).
[37] *Ibid.*
[38] *Id.* at 10–11 (¶¶ 49–50).

Center.[39] A nurse stated that "[Gibbs's] foot does not look good at all," and Dr. Pillai agreed to schedule a follow-up, but none ever occurred.[40]

When Gibbs complained that the issue was more severe than the breaking of scar tissue, Dr. Pillai allegedly retaliated by demanding that the nurse take Gibbs's crutches, provide him with a cane, and discharge him from the infirmary.[41] Dr. Pillai also refused to provide Gibbs a wedge or to allow him to buy an extra pillow for the purpose of elevating his foot.[42] Before leaving the infirmary, Gibbs demonstrated that he was unable to walk with a cane, and he asked a nurse for crutches, which she provided.[43]

In late January 2018, Physician Assistant Kevin McCyrstal berated Gibbs for allegedly having a cam boot, even though it had been returned when Gibbs left the infirmary.[44] After a nurse confirmed that Gibbs no longer had a cam boot, Gibbs asked McCyrstal if he would request the follow-up appointment Dr. Pillai had previously promised, but McCyrstal dismissed him and threatened to issue a disciplinary report if Gibbs ever returned wearing a boot.[45]

Approximately two months later, McCyrstal called Gibbs to the medical unit to discuss a request Gibbs had sent to Lightner.[46] McCyrstal assured Gibbs that he would receive a follow-up at UConn Health Center, but the follow-up never occurred.[47]

---

[39] *Id.* at 11 (¶ 51).
[40] *Ibid.* (¶ 52).
[41] *Ibid.* (¶ 53).
[42] *Id.* at 11–12 (¶ 54).
[43] *Id.* at 12 (¶ 55).
[44] *Ibid.* (¶ 57).
[45] *Ibid.*
[46] *Ibid.* (¶ 58).
[47] *Ibid.*

6

In May 2018, Gibbs met with Dr. Mazzocca, who stated that Gibbs's ankle was "exceptionally weak."[48] He told Gibbs he would order an MRI, and he "prescribed" that Gibbs be allowed to order softback sneakers.[49]

In July 2018, in accordance with Dr. Mazzocca's recommendation, Gibbs was granted a "sneaker pass," which allowed his family to purchase him softback sneakers.[50] Gibbs received the sneakers, and they helped in alleviating some of his pain and suffering.[51] They reduced the swelling in his ankles, and they enabled him to participate in recreational activities and attend his "prison programs."[52]

In October 2018, Gibbs was seen by Dr. Ross of the UConn Health Center.[53] He explained to Dr. Ross "that the post-operative course was troublesome as he didn't get adequate rehab and wasn't give[n] the right shoewear," but that "[h]e recently was given softer shoes[,] which seem to help with the pain somewhat."[54] At Gibbs's request, Dr. Ross formally recommended that he be allowed to continue wearing softer shoes; Dr. Ross also recommended that he take anti-inflammatory drugs and ice the area.[55]

Upon returning from UConn to MacDougall, Gibbs asked to be seen by medical staff so that he could discuss Dr. Ross's recommendations and inquire about how he could obtain ice, but the medical staff refused to see him.[56] Gibbs forwarded a request to medical, and he was told that he was on the list to see a doctor.[57]

---

[48] *Id.* at 13 (¶ 60).
[49] *Ibid.*
[50] *Ibid.* (¶ 61).
[51] *Ibid.* (¶ 62).
[52] *Ibid.*
[53] *Ibid.* (¶ 63).
[54] *Ibid.*
[55] *Id.* at 14 (¶ 63).
[56] *Ibid.* (¶ 64).
[57] *Ibid.* (¶ 66).

7

About one month later, Gibbs was called to medical to "see the doctor," but after forty minutes of waiting, he was sent back to his housing unit without seeing the doctor.[58] He was never called back to medical, nor did he ever receive ice for his injuries.[59] He sent several follow-up requests "to no avail."[60]

In July 2019, Gibbs's sneaker pass expired.[61] He wrote to Nurse Hollie for a renewal, and Nurse Hollie forwarded the request to Nurse Tawanna Furtique, whose responsibility it was as nursing supervisor to renew sneaker passes.[62] Gibbs reminded both Hollie and Furtique that his sneaker pass was "prescribed by ortho" and that the shoes his family had purchased for him a year before were worn out.[63] Furtique did not respond to Gibbs's sneaker-pass renewal request.[64] Around this same time, Gibbs was experiencing severe pain and swelling in his feet and ankles.[65] His worn-out shoes were no longer alleviating his pain, he could not obtain ice, and he was unable to participate in prison recreational activities or "attend his program."[66]

Several weeks later, when Gibbs happened to see Furtique, he asked why she had not responded to his sneaker-pass renewal request.[67] She responded that his request was still in her mailbox, and that she would "take care of the issue," but she never did.[68] Meanwhile, Gibbs continued to suffer in pain.[69] He was unable to complete daily tasks, participate in recreational activities, or attend his program.[70]

---

[58] *Ibid.* (¶ 67).
[59] *Ibid.*
[60] *Ibid.* (¶ 68).
[61] *Ibid.* (¶ 69).
[62] *Id.* at 14–15 (¶ 70).
[63] *Id.* at 15 (¶¶ 70–71).
[64] *Ibid.* (¶ 71).
[65] *Ibid.* (¶ 72).
[66] *Ibid.*
[67] *Ibid.* (¶ 73).
[68] *Ibid.*
[69] *Ibid.* (¶ 75).
[70] *Id.* at 16 (¶ 75).

Gibbs filed a health services grievance in September 2019, and in December 2019, having received no response to his grievance, he filed an appeal.[71] In response to his appeal, Gibbs spoke with Nurse Rose, who assured him that she would schedule an appointment for him with APRN Storkes and that she would speak to Furtique about renewing his sneaker pass.[72] He filed another health services grievance in December 2019.[73]

In January 2020, Gibbs met with Storkes, but she refused to renew his sneaker pass because she feared "Tawanna [Furtique] would get mad if [she] over[o]de[] Tawanna's authority."[74] Gibbs sent several more requests to Furtique, but they went unanswered.[75] In his requests, he stressed his severe pain and suffering as well as his "inability to obtain the necessary and recommended accommodations."[76] Gibbs filed another appeal in February 2020 as well as an additional health services complaint around the same time.[77]

In June 2020, Gibbs met with Nurse Rose.[78] Nurse Rose informed Gibbs that she had been contacted by Colleen Gallagher, the DOC's Health and Addiction Services Coordinator, who was inquiring into Gibbs's situation.[79] Gibbs explained his medical issues and grievances, including that he had never received a follow-up MRI, sneaker-pass renewal, or post-surgery rehabilitation.[80] Nurse Rose assured him that she would relay his concerns to Gallagher.[81]

---

[71] *Ibid.* (¶ 76).
[72] *Ibid.* (¶ 77).
[73] *Ibid.* (¶ 78).
[74] *Ibid.* (¶ 79).
[75] *Id.* at 16–17 (¶ 80).
[76] *Id.* at 17 (¶ 80).
[77] *Ibid.* (¶ 81).
[78] *Ibid.* (¶ 82).
[79] *Ibid.*
[80] *Ibid.*
[81] *Ibid.*

At some point after his meeting with Nurse Rose, Gibbs was called back to medical and informed that his sneaker pass would not be renewed because Gallagher "believed that doing so would only encourage other inmates to seek outside footwear."[82]

In July 2020, Gibbs was transported to an outside provider for the purpose of obtaining medically necessary footwear.[83] The provider did not have the proper softback footwear for his condition, but they informed Gibbs that they could order a "soft-collar" shoe instead.[84] He was willing to try a soft-collar shoe, even though his condition required that the entire back of his shoes be soft.[85] Gibbs was informed that the soft-collar shoes had been ordered, but he never received them.[86]

Sometime later, because Gibbs was "not getting anywhere with Tawanna [Furtique]," he wrote to Deputy Warden Snyder, who promised to investigate the matter.[87] Then, in August 2020, Gibbs's sneaker pass was finally renewed, meaning that his family could purchase for him another pair of softback shoes.[88]

Additionally, in February 2021, Gibbs finally received a follow-up MRI.[89] The MRI revealed new injuries.[90] The MRI results notwithstanding, Gibbs still has not received a follow-up consult with an orthopedist, and he continues to endure severe pain and suffering, which he attributes to the defendants' failure to provide adequate medical services.[91]

---

[82] *Ibid.* (¶ 83).
[83] *Id.* at 18 (¶ 84).
[84] *Ibid.*
[85] *Ibid.*
[86] *Ibid.*
[87] *Ibid.* (¶ 86).
[88] *Ibid.* (¶ 87).
[89] *Id.* at 19 (¶ 88).
[90] *Ibid.* (¶ 89).
[91] *Ibid.* (¶ 90).

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." A complaint may not survive an initial review pursuant to § 1915A or a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure unless it alleges facts that, taken as true, give rise to plausible grounds to sustain a plaintiff's claims for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018).[92]

A court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019). If the plaintiff is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010).

### *Eighth Amendment deliberate indifference*

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. A sentenced prisoner may assert an Eighth Amendment claim for deliberate indifference to serious medical needs. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). The prisoner must show that "(1) objectively, the alleged deprivation of medical care was 'sufficiently serious,' and (2) subjectively, that the

---

[92] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

defendants acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will result.'" *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006)). It is not enough to allege medical malpractice unless the malpractice involves culpable recklessness—actions that evince a conscious disregard of a substantial risk of serious harm. *See Hill*, 657 F.3d at 123; *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

To be "sufficiently serious," the deprivation of medical care must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill*, 657 F.3d at 122. This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. Factors to consider include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702.

In my first initial review order, I ruled that Gibbs had alleged a plausible Eighth Amendment claim against Dr. Pillai. *See Gibbs*, 2020 WL 7129584, at *7. I have no occasion now to reconsider this ruling, especially in view that Dr. Pillai—now having been served and represented by counsel—has not moved to dismiss the Eighth Amendment claim.

As to Dr. Fedus and Nurse Furtique, in my first initial review order I concluded that most of the allegations against them were time-barred because they concerned acts well beyond the three-year statute of limitations, which commenced on August 5, 2017, and because the complaint did not identify with specificity any culpable acts of Dr. Fedus and Nurse Furtique within the limitations period. *Id.* at *5–6, *8. But now on the basis of my review of the second

amended complaint, I conclude that Gibbs has alleged enough facts about non-time-barred acts that give rise to plausible grounds for relief against Dr. Fedus and Nurse Furtique.

Gibbs alleges that Dr. Fedus refused him an MRI until an MRI was eventually ordered by another doctor and occurred in October 2017.[93] After the MRI showed extensive damage, Gibbs asked Dr. Fedus in November 2017 if he could recommend "soft-back" shoes, but Dr. Fedus responded that "you were able to get yourself a MRI, you can find a way to get the shoes."[94] Dr. Fedus was "well aware" that regular shoes continued to exacerbate Gibbs's injuries and cause him pain.[95] As Gibbs puts it, "Dr. Fedus refused to provide the necessary rehabilitation and footwear to aid in the Plaintiff's recovery[,] and the Plaintiff suffered unnecessary wanton infliction of pain because of Dr. Fedus'[s] acts and omissions."[96]

Similarly, Gibbs alleges that his sneaker pass expired in July 2019 but that Nurse Furtique repeatedly refused to renew the pass and did so despite knowing that it had been prescribed for him and that he was in severe pain.[97] Accordingly, I will allow the Eighth Amendment claims to proceed against Dr. Fedus and Furtique as well as against Dr. Pillai.

As for the DOC, it is an entity of the State of Connecticut. The Eleventh Amendment precludes a claim in federal court against a state entity under 42 U.S.C. § 1983. *See Campbell v. City of Waterbury*, 2022 WL 393985, at *4 (D. Conn. 2022). Accordingly, I will dismiss the Eighth Amendment claim against the DOC.

---

[93] Doc. #26 at 8–9 (¶¶ 37–40, 37 n.6).
[94] *Id.* at 10 (¶ 46).
[95] *Ibid.*
[96] *Id.* at 21 (¶ 95).
[97] *Id.* at 14–16 (¶¶ 69–75).

*ADA and Rehabilitation Act*

Gibbs alleges claims under the ADA and Rehabilitation Act against the DOC as well as the individual defendants. But neither Title II of the ADA nor the Rehabilitation Act provides for individual capacity suits against state officials. *See Goe v. Zucker*, 43 F.4th 19, 35 (2d Cir. 2022). Further, "in a suit against a public entity, naming officials of the public entity in their official capacities adds nothing to the suit." *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010). Accordingly, I will dismiss the ADA and Rehabilitation Act claims against the three individual defendants and now turn to consider whether Gibbs has alleged a plausible ADA and Rehabilitation Act claim against the DOC.[98]

The Second Circuit has explained that in order to establish a *prima facie* violation under the ADA and the Rehabilitation Act, a plaintiff must show that (1) "he is a qualified individual with a disability"; (2) "[the defendant] is an entity subject to the acts"; and (3) "he was denied the opportunity to participate in or benefit from [the defendant's] services, programs, or activities or [the defendant] otherwise discriminated against him by reason of his disability." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

For the purpose of their motion to dismiss, the DOC does not contest that Gibbs is a qualified individual with a disability under the first prong. Nor as to the second prong does the DOC contest that Title II of the ADA and the Rehabilitation Act do not allow a prison to discriminate by reason of disability against a prisoner with respect to the prisoner's access to the prison's services, programs, and activities. *See Wright*, 831 F.3d at 72.

---

[98] Although the DOC has moved to dismiss the claims under the ADA and Rehabilitation Act, it does not argue that it has immunity under the Eleventh Amendment from either or both claims. *See Barrett-Browning v. Dep't of Corr.*, 2020 WL 5118132, at *3–4 (D. Conn. 2020) (concluding that Connecticut has waived its Eleventh Amendment immunity for claims under the Rehabilitation Act); *Hicks v. Armstrong*, 116 F. Supp. 2d 287, 290–91 (D. Conn. 1999) (concluding that Congress has abrogated Eleventh Amendment immunity with respect to prisoner claims for services under Title II of the ADA and the Rehabilitation Act).

There are "three available theories" of discrimination that can be used to establish the third prong of an ADA and Rehabilitation Act claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009). Gibbs proceeds solely on a failure-to-accommodate theory.[99] For a failure-to-accommodate claim, a prisoner must show that the failure to accommodate resulted as a practical matter in a denial of meaningful access to the prison's services or programs. *See Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 62 (2d Cir. 2021); *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91–92 (2d Cir. 2021).

Gibbs alleges that the DOC failed to accommodate his disability such that he "was denied access to and excluded from receiving the benefits of medical (rehabilitation) services."[100] But this aspect of his claim is hopelessly circular. The accommodation he wants (*i.e.*, footwear and ice) is the same as the service (*i.e.*, post-surgery medical/rehabilitation services in the form of footwear and ice) to which he claims the failure to accommodate has denied him access. His claim amounts to no more than a claim for denial of medical services, and as I have previously ruled, a prisoner's claim that he has been denied medical care to treat his disability is not enough for an ADA or Rehabilitation Act claim absent a showing that he was denied the medical care by reason of his disability. *See Gibbs*, 2020 WL 7129584, at *9–10.

On the other hand, Gibbs further alleges that DOC's failure to accommodate him in the form of soft sneakers and ice has constructively denied him access to DOC's recreational activities and other prison programs. In his own words, "[w]ithout reasonable accommodations consisting of ice (when needed) and proper footwear, [he] could not/cannot participate in and

---

[99] Doc. #32 at 15–16.
[100] Doc. #26 at 25 (¶ 104).

15

was excluded/deterred from receiving the benefits of recreational activities … [and] attending his prison programs."[101]

It appears to me that this alleges plausible grounds for a failure-to-accommodate claim under the ADA and Rehabilitation Act. It is plausible to conclude that if a prisoner can barely walk for lack of proper footwear and ice treatment, then the prisoner has been denied meaningful access to programs such as recreational programs that are away from the prisoner's cell. Although Gibbs does not detail the particulars of the programs from which he was excluded, he has alleged that he wished to participate in them, and it is plausible to conclude that a prison would have at least some programs and services for which a prisoner may participate only by leaving his cell. Accordingly, I will allow Gibbs's claim against the DOC to proceed under the ADA and Rehabilitation Act to the extent that it is based on Gibbs' claim that the DOC has failed to grant a reasonable accommodation that would allow him to meaningfully access prison recreational programming or other programs.

## CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part the partial motion to dismiss of the DOC and Dr. Pillai (Doc. #31). It GRANTS the motion as to Dr. Pillai as to the ADA and Rehabilitation Act claim but DENIES the motion as to the DOC.

Pursuant to 28 U.S.C. § 1915A, the Court otherwise concludes that Gibbs has failed to allege a plausible claim for relief against Dr. Fedus and Nurse Furtique under the ADA and Rehabilitation Act. On the other hand, the Court concludes that Gibbs has alleged plausible claims for relief that may proceed against Dr. Pillai, Dr. Fedus, and Nurse Furtique under the

---

[101] *Ibid.* (¶¶ 105–106).

Eighth Amendment. The foregoing federal law claims as well as Gibbs's state law claim may proceed for further litigation in this action.

It is so ordered.

Dated at New Haven this 8th day of September 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge
