UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DAVID GIBBS,
    *Plaintiff*,

v.

OMPRAKASH PILLAI *et al.*,
    *Defendants*.

No. 3:20-cv-01119 (JAM)

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

David Gibbs is an inmate serving a life sentence at the MacDougall-Walker Correctional Institution ("MacDougall") in Connecticut. In October 2017, Gibbs underwent surgery aimed at addressing ongoing problems with his left Achilles tendon. The aftermath of that surgery is the subject of this action.

Gibbs claims that one of the defendants, Dr. Omprakash Pillai, deprived him of adequate medical care while he recovered from surgery. He further claims that a second defendant, Nurse Supervisor Tawanna Furtick, repeatedly ignored his requests for special footwear that would mitigate lingering post-surgery pain in his Achilles tendon. He now sues both defendants pursuant to 42 U.S.C. § 1983 for deliberate indifference to his serious medical needs in violation of the Eighth Amendment, as well as for "reckless, wanton, and/or willful misconduct" under state law. In addition, Gibbs alleges that the Department of Correction ("DOC") violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act by failing to provide ice and soft-backed shoes as reasonable accommodations for his disability.

The parties have now filed cross motions for summary judgment. For the reasons discussed below, I will grant the defendants' motion and deny Gibbs's motion. First, I conclude that Gibbs failed to exhaust his administrative remedies before bringing his claims under the ADA and Rehabilitation Act. Second, I conclude that there is no genuine issue of fact to support

1

Gibbs's claims for deliberate indifference under the Eighth Amendment. Third, I conclude that there is no genuine issue of fact to support Gibbs's pendent state law claims for reckless, wanton, and/or willful misconduct.

## BACKGROUND

Gibbs's case has been ongoing since August 2020. His original complaint named more than half a dozen DOC medical personnel and institutional defendants.[1] Pursuant to 28 U.S.C. § 1915A, I issued an initial review order dismissing all but one of his claims.[2]

Gibbs later filed amended complaints in January and June 2021—those complaints again brought claims against a large number of defendants.[3] The DOC and Dr. Pillai filed a partial motion to dismiss in September 2021, which I granted in part and denied in part in a second initial review order.[4] I permitted Gibbs to proceed with claims against Dr. Pillai, Nurse Furtick, and Dr. Henry Fedus under the Eighth Amendment, as well as against the DOC under the ADA/Rehabilitation Act.[5] The parties ultimately stipulated to the dismissal of Dr. Fedus, leaving only the claims against Dr. Pillai, Nurse Furtick, and the DOC.[6]

For purposes of this ruling, the relevant chronology begins with Gibbs's Achilles tendon surgery. That surgery—which consisted of a left Achilles tendon debridement and reattachment, a left calcaneal bone excision, and a left flexor hallucis longus transfer—took place on October 31, 2017.[7] Gibbs spent the next two months in the infirmary.[8] Dr. Pillai oversaw the infirmary at

---

[1] Doc. #1 at 1.
[2] Doc. #9 at 18.
[3] Doc. #12 at 1; Doc. #26 at 3.
[4] Doc. #35 at 16-17; Doc. #31.
[5] Doc. #35 at 16-17.
[6] Doc. #48 at 1.
[7] Doc. #72-2 at 22 (¶¶ 112-13).
[8] *Id.* at 23, 29-30 (¶¶ 116, 146).

that point in time.[9] He, together with the rest of the MacDougall medical staff, monitored Gibbs's recovery during his stay in the infirmary.[10]

The medical staff checked on Gibbs daily during his convalescence.[11] They provided him with pain medication as necessary and examined his left ankle at regular intervals.[12] Through the beginning of January 2018, Gibbs did not experience any substantial setbacks.[13] On November 27, 2017, he received an X-ray, which did not reveal "any significant bony, joint space, or soft tissue abnormalities."[14] Gibbs also wore a CAM boot during part of his recovery.[15] His UCONN orthopedist recommended removing the boot on December 26, 2017, and it was ultimately removed sometime in January.[16]

On January 2, 2018, Gibbs walked into the infirmary treatment room on crutches and complained that his foot was swollen.[17] The nurse who evaluated him noted the swelling, and Dr. Pillai performed a follow-up examination the same day.[18] But Dr. Pillai did not order further treatment.[19] He instead advised Gibbs on steps he should take to continue recovery when Gibbs was back in the general prison population.[20]

Dr. Pillai discharged Gibbs the next day.[21] As he did so, he entered several orders: first, he directed Gibbs's crutches be exchanged for a cane; second, he prescribed Gibbs the blood

---

[9] *Id.* at 23 (¶ 118)
[10] *Id.* at 23-24 (¶¶ 118-19, 121-22).
[11] *Id.* at 24-25 (¶¶ 122, 124-125).
[12] *Id.* at 24-26 (¶¶ 124-127, 130, 134).
[13] *Id.* at 25-26 (¶¶ 126-27, 130, 133-34).
[14] *Id.* at 26 (¶ 130).
[15] *Id.* at 25-26 (¶¶ 129, 134).
[16] *Id.* at 27, 31 (¶¶ 137, 152); Doc. #82-1 at 7-8 (¶ 23). The parties dispute when precisely Gibbs stopped using the CAM boot but agree that it was sometime in January. Doc. #72-2 at 31 (¶ 152); Doc. #82-1 at 7-8 (¶ 23). I ultimately find that the precise date is immaterial.
[17] Doc. #72-2 at 28 (¶ 141).
[18] *Id.* at 28 (¶¶ 141-42).
[19] *Id.* at 29 (¶¶ 143-145).
[20] *Id.* at 29 (¶ 145).
[21] *Id.* at 29-30 (¶ 146)

3

pressure medication Norvasc; and third, he arranged for Gibbs to receive bottom bunk for six months.[22] But the first order was never carried out. Gibbs complained that his ankle was still weak, and a nurse returned his crutches before he left the infirmary.[23] Nevertheless, Gibbs's ankle was not swollen or red on that day, and he was able to walk with a steady gait.[24]

After returning to the general prison population, Gibbs continued to experience ankle problems.[25] He had additional appointments for his Achilles tendon in March, April, and May of 2018.[26] During the second of these visits, he had an X-ray, which revealed a large bone spur.[27] During the third visit, a UCONN orthopedist recommended soft-backed shoes.[28] And at Gibbs's one-year follow-up on October 5, 2018, Dr. John Ross reiterated that Gibbs should wear soft shoes, and further recommended ice and anti-inflammatory medications.[29]

Gibbs requested soft-backed shoes on several occasions during subsequent appointments with the nursing staff.[30] Ultimately, Nurse Good entered an order (at the direction of Dr. Naqvi) for Gibbs to receive a pass to permit him to wear such shoes.[31] That pass remained active until around July 2019.[32] It then expired and was not renewed for around a year.[33]

During the year that Gibbs did not have access to adequate soft-backed shoes, his participation in prisoner recreational programs declined.[34] He continued to go to his job, which he described as a matter of "life and death."[35] But when he would return to his cell and remove

---

[22] *Id.* at 30 (¶¶ 147-148).
[23] *Id.* at 30-31 (¶¶ 150-51).
[24] *Id.* at 29-30 (¶ 146).
[25] *Id.* at 31, 35 (¶¶ 153, 171).
[26] *Id.* at 31-32 (¶¶ 153-55).
[27] *Id.* at 31 (¶ 154).
[28] *Id.* at 31-32, 36 (¶¶ 155, 174).
[29] *Id.* at 36-38 (¶¶ 176, 182).
[30] *Id.* at 35-36 (¶ 171-72, 174).
[31] *Id.* at 36 (¶ 175).
[32] *Ibid.*; Doc. #56-1 at 40.
[33] *Ibid.*
[34] Doc. #72-3 at 6 (¶¶ 54-56); *id.* at 87 (¶¶ 28-31); *id.* at 84.
[35] Doc. #60-1 at 59. Gibbs testified that he would be unable to afford basic necessities like toothpaste without his

4

his hard-backed shoes, "[n]othing [could] touch [his] foot," which he described as "like fire."[36] He "[could] not tolerat[e] that level of pain" in order to participate in activities after he finished work.[37] And so Gibbs stopped attending his Meditation Program, the gym, and recreation.[38]

Gibbs made repeated efforts, both through informal conversations and formal requests, to have his sneaker pass updated.[39] He alleges that Nurse Furtick was responsible for the renewal.[40] He further asserts that she promised to renew his pass in various conversations with him but did not do so.[41]

When he was deposed during this litigation, Gibbs claimed that at some point in time before filing this lawsuit he met with the Unit ADA Coordinator about the issue.[42] He did not receive the shoes he requested, but nor did he pursue the issue further through the filing of an ADA appeal.[43]

Ultimately, Gibbs received new sneakers in August 2020 which largely ended much of the dispute.[44] Gibbs claims that he was able to return to many of his normal activities after receiving replacement footwear.[45] Nevertheless, he brought this action seeking damages for his suffering. He also requests several forms of injunctive relief: an order directing the DOC to provide him with a medical appointment with a qualified outside provider; an order removing the

---

job. *Ibid.*
[36] *Id.* at 58-59.
[37] *Id.* at 59.
[38] Doc. #72-3 at 5-6 (¶¶ 51-56).
[39] *Id.* at 5 (¶¶ 48-50); Doc. #56-5 at 22-26; Doc. #60-1 at 34-40; *id.* at 66
[40] *Id.* at 34-40.
[41] Doc. #72-3 at 5 (¶ 50); Doc. #60-1 at 34-35.
[42] Doc. #56-5 at 23-24.
[43] *Id.* at 22-24.
[44] Doc. #82-1 at 28 (¶¶ 65-66).
[45] Doc. #72-3 at 6 (¶¶ 67-70).

expiration date on his pass permitting soft-backed shoes; and an order directing that he can obtain ice when needed.[46]

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough to allow a reasonable jury to decide the case in favor of that party. If so, I must deny summary judgment. My role at this stage is not to judge the credibility of witnesses or to resolve close and contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Kerson v. Vermont L. Sch., Inc.*, 79 F.4th 257, 262 (2d Cir. 2023).[47]

### *ADA and Rehabilitation Act*

The defendants argue that Gibbs failed to exhaust his administrative remedies for his claims under the ADA and the Rehabilitation Act. The Prison Litigation Reform Act (PLRA) mandates that prisoners exhaust any available administrative remedies before filing federal claims about prison conditions. *See* 42 U.S.C. § 1997e(a). The only exception to this rule is if an administrative process is not "available." *See Romano v. Ulrich*, 49 F.4th 148, 153 (2d Cir. 2022) (citing *Ross v. Blake*, 578 U.S. 632 (2016)). The administrative process is not "available" in three circumstances: (1) "if it operates as a simple dead end," (2) if is "so opaque that it becomes,

---

[46] Doc. #26 at 26 (¶¶ A1-A3).
[47] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

practically speaking, incapable of use," or (3) if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ibid.*

In order to exhaust his ADA/Rehabilitation Act claim, Gibbs needed to follow the procedures described in Administrative Directive 10.19.[48] That Directive set out a three-step process. First, Gibbs needed to make an oral or written request of any staff person.[49] If that request was denied, Gibbs needed to meet with his Unit ADA Coordinator to review the disposition.[50] Finally, if Gibbs were still dissatisfied with the decision, he needed to file an appeal of the ADA decision in accordance with the procedure set out in Administrative Directive 9.6—specifically, to file an appeal within 15 days of his meeting with the Unit ADA Coordinator.[51]

Gibbs concedes that he did not appeal, that he had access to the administrative remedies process, and that the process was available to him.[52] Gibbs testified during his deposition that at some point in time before filing this lawsuit he met with the ADA Coordinator but chose not to appeal when he did not receive relief because the ADA Coordinator told him that she would look into the issue.[53] Gibbs denied being prevented from filing an appeal and claimed instead that the "last thing" he wanted to do was "file a grievance, because the report from that would be

---

[48] The version of Administrative Directive 10.19 that governed Gibbs's complaints came into effect on August 1, 2014, and was superseded on September 24, 2021. I take judicial notice of the content of the earlier administrative directive, which the parties have not filed but which has been previously filed in another federal case, *Walsh v. Coleman et al.*, 19-cv-00980-JAM, Doc. #42-12.
[49] *See* Administrative Directive 10.19 at § 7(A)(1), *Walsh v. Coleman et al.*, 19-cv-00980-JAM, Doc. #42-12 at 6.
[50] *Id.* at § 7(C).
[51] *Id.* at § 8; Doc. #56-4 at 18 (§ 15 of Administrative Directive 9.6) ("An ADA decision may be appealed by completing and depositing CN 9602, Inmate Administrative Remedy Form, in the Administrative Remedies box within 15 calendar days of meeting with the Unit ADA Coordinator.").
[52] Doc. #72-2 at 5 (¶¶ 20-21).
[53] Doc. #56-5 at 23-25.

7

harsh."[54] This testimony shows that Gibbs voluntarily chose not to exhaust his administrative remedies despite not receiving the relief he requested. "The administrative exhaustion process is not unavailable for purposes of the PLRA when an inmate simply chooses not to avail himself of it." *Taylor v. New York City Dept. of Corrections*, 849 Fed. Appx. 5, 8 (2d Cir. 2021).

Even crediting Gibbs' claim that the ADA Coordinator delayed—rather than denied—his request for an accommodation, this would not have relieved Gibbs from appealing after it was apparent as the days, weeks, and months went by that he had not received his requested relief. The form that Gibbs would have used to appeal the Unit ADA coordinator's decision, CN 9602, contemplates an inmate "not receiv[ing] a timely response to the inmate request." *Taveras v. Semple*, 2023 WL 112848, at *10 (D. Conn. 2023). Thus, "the administrative remedies under A.D. 9.6 were not unavailable to plaintiff merely because prison officials did not respond to his informal request and grievance." *Ibid.*

Moreover, Gibbs has shifted his position in response to the defendants' summary judgment motion. Now he claims—contrary to his deposition testimony—that he never met at all with the ADA Coordinator before filing this lawsuit and before his sneaker pass was ultimately renewed.[55] If so, then this equally means that Gibbs failed to exhaust his administrative remedies

---

[54] Doc. #56-5 at 26.

[55] Doc. #72-1 at 7-8 (stating that Gibbs "when being deposed by the Defendants, was unclear as to the dates when the Plaintiff actually did meet with the Unit ADA Coordinator" and that Gibbs "did not meet with the Unit ADA Coordinator any time during July of 2019 through August of 2020, regarding the delay in renewing his sneaker pass").

because it demonstrates that he did not seek a remedy in the first instance from the ADA Coordinator.

In short, Gibbs failed to exhaust his claim under the ADA and the Rehabilitation Act. Therefore, I will grant the defendants' motion for summary judgment on Gibbs's claims under the ADA and the Rehabilitation Act.

### *Deliberate indifference*

Unlike the ADA and Rehabilitation Act claims, the record discloses a genuine dispute of material fact as to whether Gibbs exhausted his deliberate indifference claims.[56] Nevertheless, I conclude that Dr. Pillai and Nurse Furtick are entitled to summary judgment on the merits of those claims.

The parties agree that to prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must show (1) a sufficiently serious deprivation of adequate medical care and (2) the defendant's awareness of a substantial risk that serious harm to the plaintiff would result from her action or inaction. *See Spavone v. N.Y. State Dept. of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). The first of these requirements is objective, while the second is subjective. *Ibid.* The objective component demands a "'condition of urgency, one that may produce death,

---

[56] The parties agree that in order to exhaust his administrative remedies regarding a healthcare decision, Gibbs needed to (1) seek an informal resolution of the issue or properly file a CN 9601 form; (2) properly file a CN 9602 form; and (3) go through a health services review appointment with an appropriate care provider. Doc. #72-2 at 9-10 (¶¶ 45-49). Gibbs offers admissible evidence that he complied with the first two steps, but did not receive any response. Doc. #72-3 at 5, 7, 10-12, 23-28, 56-65. Nevertheless, Gibbs persisted—he also claims to have filed a later "Appeal of Health Services Review," which was rejected. *Id.* at 23-28. The defendants assert that Gibbs must not have dropped his forms in the correct box, because they have no record of his administrative efforts. *See* Doc. #56-1 at 15-16. But if what Gibbs alleges is true—and he has enough evidence to at least create a genuine dispute on these points—he would have exhausted every administrative avenue available to him. The failure of prison officials to schedule a medical appointment can hardly be held against Gibbs if he proceeded to make use of the next potential remedy available to him. *See Baltas v. Maiga*, 2022 WL 3646199, *13-14 (D. Conn. 2022) (prisoner who completed all levels of the grievance process had exhausted remedies despite correctional officials' failure to respond to any of the grievances); *cf. Hayes v. Dahlke*, 976 F.3d 259, 268, 270 (2d Cir. 2020) (prisoner exhausted administrative remedies when he completed the entire remedies procedure but prison officials failed to respond within allotted time).

degeneration, or extreme pain.'" *Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). The subjective component requires a state of mind that is equivalent to criminal recklessness. *See Matzell v. Annucci*, 64 F.4th 425, 435 (2d Cir. 2023).

Gibbs fails to point to evidence to suggest that Dr. Pillai acted with a subjective state of mind akin to criminal recklessness. He draws attention to a handful of facts, including (1) Dr. Pillai's failure to remove Gibbs's CAM boot on the timeline recommended by the UCONN orthopedist; (2) Gibbs's development of a large spur in his foot sometime during or shortly after his discharge from the infirmary; (3) Dr. Pillai's decision to discharge Gibbs shortly after he complained that his ankle was swollen; and (4) Dr. Pillai's order that Gibbs's crutches be exchanged for a cane.[57] But none of these facts remotely suggest that Dr. Pillai was deliberately or recklessly indifferent to Gibbs's health needs.

Start with the CAM boot. Gibbs has offered evidence that the UCONN orthopedist recommended the boot be removed on December 26, 2017, and that the boot was not in fact removed until sometime in January 2018.[58] What he does not provide is any explanation as to how that outcome could have created a risk of serious harm. Gibbs puts forth no evidence that wearing the CAM boot for an extra month put him at risk of impaired recovery or future injury— he simply alleges that it happened. This delay does not suggest criminal recklessness.

Likewise, the fact that Gibbs developed a bone spur during his time in Dr. Pillai's care says nothing about Dr. Pillai's mental state. Gibbs has not indicated why a bone spur demonstrates improper care, let alone how it evinces recklessness. Nor has he even provided evidence that the bone spur developed while he was in the infirmary. As with the prolonged use

---

[57] Doc. #72-1 at 14-17.
[58] Doc. #72-2 at 27, 31 (¶¶ 137, 152); Doc. #82-1 at 7-8 (¶ 23)

of the CAM boot, the fact that Gibbs's condition worsened by means of the development of a bone spur does not suggest that Dr. Pillai acted with criminal recklessness.

The timing of Gibbs's discharge is potentially more probative. However, the undisputed events surrounding the discharge make clear that Dr. Pillai's decision was not reckless. Gibbs reported swelling to Dr. Pillai the day prior to his discharge, but Dr. Pillai did not ignore that swelling—he performed an examination.[59] When Gibbs was discharged the next day, his ankle was admittedly not swollen or red, and he was able to walk with a steady gait.[60] *Cf. Munger v. Cahill*, 792 F. App'x 110, 112 (2d Cir. 2020) (no subjective indifference when doctor discontinued inmate's opioid prescription after an examination which revealed that the inmate could ambulate without issue despite back pain). Moreover, Dr. Pillai issued several orders in conjunction with the discharge, including one that Gibbs receive bottom bunk for six months.[61] In light of these facts, the timing of Gibbs's discharge does not create a genuine issue of fact to suggest that Dr. Pillai was deliberately or recklessly indifferent to Gibbs's serious medical needs.

Nor did Dr. Pillai ignore a serious risk to Gibbs's health by attempting to replace Gibbs's crutches with a cane. As mentioned above, Gibbs was able to walk steadily at the time of his discharge, which belies the notion that Dr. Pillai ignored a serious health threat by exchanging the crutches for a cane.[62] Moreover, Dr. Pillai's decision to provide some sort of walking aid indicates that he was not withholding treatment. Whether a cane was a better solution than crutches is beside the point, because disputes over the choice of care—as opposed to the provision of some care—do not rise to the level of a deliberate indifference claim. *See Hill v.*

---

[59] Doc. #72-2 at 28 (¶ 142).
[60] *Id.* at 29-30 (¶ 146).
[61] *Id.* at 30 (¶ 148).
[62] *Id.* at 29-30 (¶ 146).

*Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (neither non-reckless medical malpractice nor a disagreement about the appropriate treatment gives rise to a deliberate indifference claim).

And in any event, Dr. Pillai's order certainly could not have caused Gibbs harm, because Gibbs had his crutches returned before he left the infirmary.[63] This last fact is relevant to the extent that Gibbs's case against Dr. Pillai rests on the cane order because an action under § 1983 requires causation of injury. *See McDaniel v. City of New York*, 585 F. Supp. 3d 503, 512 (S.D.N.Y. 2022) (citing *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998)).[64]

In short, Gibbs's evidence is not enough to create a genuine fact issue for trial on his claim that Dr. Pillai was deliberately or recklessly indifferent to Gibbs's serious medical needs. To the contrary, the record shows that Dr. Pillai did not ignore Gibbs's needs and took a wide variety of steps to treat Gibbs.[65] Accordingly, I will grant summary judgment for Dr. Pillai on Gibbs's Eighth Amendment claim.

Gibbs's claim against Nurse Furtick also lacks merit but for a different reason: her alleged failure to renew his sneaker pass does not meet the objective prong requirement for an Eighth Amendment claim: that she subjected him to a substantially serious deprivation of adequate medical care. In evaluating the seriousness of a deprivation, the Court must consider "'what harm, if any, the [deprivation] has caused or will likely cause the prisoner.'" *Kucharczyk v. Westchester Cnty.*, 95 F Supp. 3d. 529, 537 (S.D.N.Y. 2015) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006)). In cases such as this one—which deals with an interruption in medical treatment rather than an outright denial of medical care—"'the seriousness inquiry is

---

[63] *Id.* at 30-31 (¶ 151).
[64] In his own motion for summary judgment, Gibbs also points to several post-discharge inmate request forms he addressed to Dr. Pillai that sought a follow-up appointment. Doc. #57-1 at 12. He claims that Dr. Pillai ignored these requests, providing evidence of culpable recklessness. *Ibid.* But Gibbs offers no evidence that Dr. Pillai ever received these forms—and as he himself observes, a nurse ultimately scheduled his appointment. *Ibid.*
[65] *See, e.g.*, Doc. #72-2 at 24, 26-30 (¶¶ 122, 130, 134, 138, 142, 145, 147-48).

narrower,' and the analysis focuses 'on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Benjamin v. Pillai*, 2018 WL 704998, at \*3 (D. Conn. 2018) (quoting *Salahuddin*, 467 F.3d at 280).

As Judge Furman has observed, "courts in this Circuit have consistently found that pain and other problems resulting from being forced to wear institutional footwear are not sufficiently serious to satisfy [the objective] prong [of an Eighth Amendment claim for deliberate indifference to serious medical needs]." *Stevens v. City of New York*, 2013 WL 81327, at \*3 (S.D.N.Y. 2013), *aff'd* 541 F. App'x 111 (2d Cir. 2013). For example, in *Jones v. Ng*, 2015 WL 998467 (S.D.N.Y. 2015), a prisoner plaintiff alleged that denial of orthopedic shoes caused swelling, an abscess, and daily walking pain—nevertheless, the court held that this would be insufficient to state an Eighth Amendment claim. *Id.* at \*7.

Even if I were to conclude that Nurse Furtick's requiring of Gibbs to wear institutional footwear satisfied the objective prong, Nurse Furtick would still be entitled to qualified immunity in light of the prior precedent holding that requiring a prisoner to wear institutional footwear does not violate the Eighth Amendment. Nurse Furtick has qualified immunity to the extent that her alleged misconduct did not violate clearly established law. *See, e.g., Vega v. Semple*, 963 F.3d 259, 274 (2d Cir. 2020). "[W]here there is nothing more than a 'mix of authority' in the case law as to whether alleged conduct might or might not violate the Constitution, it cannot be said that such conduct transgresses clearly established law." *Mustafa v. Pelletier*, 2023 WL 7537625, at \*2 (2d Cir. 2023).

In short, there is no genuine issue of fact to suggest that Nurse Furtick's alleged misconduct concerned an objectively serious medical need. In the alternative, Nurse Furtick is

13

entitled to qualified immunity. Accordingly, I will grant Nurse Furtick's motion for summary judgment with respect to Gibbs's Eighth Amendment claim.

### *Gibbs's state law claims*

Gibbs's state law claims against Dr. Pillai and Nurse Furtick allege "reckless, wanton, and/or willful misconduct."[66] Such conduct requires "'an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.'" *Di Teresi v. Stamford Health Sys., Inc.*, 142 Conn. App. 72, 90 (2013) (quoting *Elliott v. Waterbury*, 245 Conn. 385, 415 (1998)). Of particular relevance here, mere "'thoughtlessness or inadvertence, or simpl[e] inattention'" is insufficient. *Ibid.* (quoting *Dubay v. Irish*, 207 Conn. 518, 533 (1988)).

The defendants argue that Gibbs has failed to adduce evidence demonstrating this elevated mental state requirement.[67] I agree. As the defendants note, there is no evidence that Dr. Pillai and Nurse Furtick engaged in willful or clearly dangerous omissions. The record suggests—at most—that there was negligence, not recklessness. But even if Gibbs has established that much, none of his evidence indicates that his medical providers were involved in an "extreme departure" from the ordinary standard of care in a situation where a "high degree of danger is present." *Ibid.* While I do not doubt Gibbs's discomfort, it would be inaccurate to

---

[66] Doc. #26 at 25-26 (¶ 109).
[67] Doc. #56-1 at 44-45.

characterize his foot problems as posing a "high degree of danger," particularly given that he was able to continue working despite his condition.[68]

In short, there is no genuine issue of fact to suggest that Dr. Pillai or Nurse Furtick engaged in reckless, wanton, or willful misconduct. Accordingly, I will grant their motion for summary judgment with respect to Gibbs's state law claims.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motion for summary judgment (Doc. #56) and DENIES Gibbs's cross-motion for summary judgment (Doc. #57). The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 19th day of March 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[68] Doc. #56-5 at 9-15.